TREGLOWN and wife, Appellants, v. DEPARTMENT OF HEALTH & SOCIAL SERVICES, Respondent.

*February 1—February 27, 1968.*

318

For the appellants there was a brief by *Morse, Morse & Roggensack* of Lancaster, and oral argument by *R. R. Roggensack.*

For the respondent there was a brief by *Charles C. Lubcke,* collection and deportation counsel, and *James R. Pleyte* and *Robert H. Kletzien,* assistant counsel, and oral argument by *Mr. Pleyte.*

ROBERT W. HANSEN, J.   Are these parents liable for the maintenance costs of their minor son during his confinement at Central State Hospital on a commitment made pursuant to sec. 957.11 (3), Stats.?   The trial judge answered this question, Yes.   This court answers the question, No, and this decision sets forth the reasoning for the differing conclusion.

This action is brought under the provisions of sec. 46.10 (2) of the Wisconsin Statutes providing:

"(2) Any . . . patient in any charitable or curative institution of the state . . . in which the state is chargeable with all or a part of the patient's maintenance . . . and in the case of a minor child the father or mother of the patient, and their property and estates, including their homesteads shall be liable for such patient's maintenance not exceeding the actual per capita cost thereof . . . and the department may bring action for the enforcement of such liability . . . ."

The trial judge found that "the liability of parents for the treatment of a minor child, as established by sec. 46.10 (2), Wis. Stats., exists if the institution designated

is a charitable or curative institution. The court finds that Central State Hospital is such an institution."

Under the cases heretofore decided, it appears clear that the Central State Hospital at Waupun cannot be thus designated as a "charitable or curative institution" in all situations, regardless of the nature and purpose of the commitment in a particular case. Neither can the Central State Hospital be found to be not a "charitable or curative institution" in all cases and situations. In each category of cases at least, the court must inquire into the exact purpose and nature of the commitment made to determine whether sec. 46.10 (2), Stats., applies. The answer of this court has been different in different situations.

In *Guardianship of Sprain*,[1] Sprain, who was charged with murder, was sent to Central State Hospital for observation as to his sanity. After five months, he was returned to court. He was found to be insane. His trial was postponed indefinitely. He was committed to Central State Hospital and remained there for nearly five years. The State Board of Control, acting under the statutory equivalent of sec. 46.10 (2), Stats.,[2] sought to charge his estate for his maintenance for the five-month observation period and the five-year confinement as insane period. The guardian objected only to the charge for the five-month observation period. The court concluded that the estate could not be charged for hospitalization expenses during the five-month period while the patient was held for observation because he was held under a criminal warrant and the purpose of such confinement was incidental to his prosecution for a crime. While lia-

[1] (1935), 219 Wis. 591, 263 N. W. 648.

[2] Sec. 49.10, Stats. 1933. In 1935, this statute was recreated (as affects this case) as sec. 46.10 (7), Stats. Laws of 1935, ch. 336. In 1947, sec. 46.10 (7) was revised (with no change affecting this case) and became sec. 46.10 (2), Laws of 1947, ch. 268, sec. 23. See comment of 1947 interim committee under sec. 46.10 in 1960 Wisconsin Annotations.

bility for the longer period was not disputed, the court approved charges against the estate for the period of confinement following his being found insane and his re-commitment to the Central State Hospital for hospitalization as insane.

In *Guardianship of Gardner*,[3] Gardner had been convicted of statutory rape, sentenced to the state penitentiary for a ten-year term. While serving his sentence, he was adjudged insane and transferred to the Central State Hospital. The state made claim against his estate for maintenance costs while he was confined at Central State Hospital. This court denied the liability of the estate deeming the hospital confinement directly referrable to his incarceration, noting that his prison sentence was running during his detention period in the hospital. This holds that there is no estate liability for maintenance of a patient at Central State Hospital transferred there from prison for confinement coinciding with his prison sentence.

In *Guardianship of Radoll*,[4] Radoll was charged with assault while armed with intent to murder. He was committed to Central State Hospital for a period of observation not to exceed thirty days. At the termination of this observation period, he was returned to court, adjudged insane. All proceedings were stayed and he was committed to the Central State Hospital for the criminally insane until he recovered and could face trial. The State Board of Control filed claim for care and maintenance at the hospital of the incompetent. Once again, this court stated that the guardian was not liable for care and support of the ward during the observation period. Once again, this court stated that the guardian was liable where, upon a finding of present insanity, the trial was postponed and the incompetent was confined in the Cen-

[3] (1936), 220 Wis. 490, 264 N. W. 647.
[4] (1936), 222 Wis. 539, 269 N. W. 305.

tral State Hospital for the insane until he recovered and could face trial.

Viewed together, these three cases hold (1) no estate liability for maintenance at Central State Hospital when the patient was committed for observation to determine his sanity to stand trial; (2) estate liability for maintenance at Central State Hospital when, on a finding of present insanity, proceedings are stayed and the patient has been committed until able to stand trial; (3) no estate liability for maintenance at Central State Hospital when the patient was committed after having been sentenced to prison and while serving his term.

For the first time, the case now before us presents a fourth situation—the question of parental liability for maintenance costs at Central State Hospital for a minor child committed because of his acquittal based on insanity at the time of the commission of an alleged crime. The trial judge in this case concluded: "Upon the finding of not guilty it follows that any commitment has no criminal implications whatsoever and that the person so committed stands in the same relationship as if committed under sec. 51.05, Wis. Stats." We feel that there are significant differences between commitments under sec. 51.05, Stats., and the statute involved in the present case, sec. 957.11 (3), particularly in the provisions governing release.

Under the Mental Health Act, ch. 51, Stats., upon a finding by court or jury of insanity from a medical standpoint sufficient for civil commitment, the person is committed to a hospital for treatment until recovered.[5] Recovery from mental illness is the sole test for release. In fact, in some cases, the patient, confined in a treatment

[5] As stated in *Simecek v. State* (1943), 243 Wis. 439, 447, 10 N. W. 2d 161; ". . . insanity from a medical standpoint does not necessarily constitute legal insanity in the sense that it constitutes a defense in prosecutions for crime. One may be medically insane and yet be criminally responsible for his acts." *See also Kwosek v. State* (1960), 8 Wis. 2d 640, 651, 100 N. W. 2d 339.

facility in a civil commitment proceeding, may be released before fully recovered. Sec. 51.11 (5), provides that the court may order discharge of a patient if it determines that he is no longer "in need of care and treatment." Under sec. 51.12 (4), the superintendent of any state or county hospital or mental health center, with the approval of the Department of Health and Social Services necessary outside of Milwaukee county, may discharge any patient who in his judgment is recovered or who is not recovered but whose discharge will not be detrimental to the public welfare or injurious to the patient. Under sec. 51.13 (1) and (2), the superintendents of certain state mental institutions may grant conditional releases to patients if, in their opinion, "it is proper to do so," or upon the written recommendation of the visiting physician. This emphasis upon release as soon as recovery or the welfare of the patient permits establishes the nature and purpose of the confinement: treatment for the illness involved.

In the case of commitments made under sec. 957.13, Stats., as involved in the *Sprain* and *Radoll* cases, *supra,* the provisions for release are less flexible but the clear test is the recovery of the patient. Commitment under this statute is made only where the court finds that the defendant ". . . as a result of mental illness or deficiency lacks capacity to understand the proceedings against him or to assist in his own defense." Recovery from such incapability of understanding is the sole test for return to the court to face further proceedings. Sec. 957.13 (3) provides: "When the hospital superintendent considers that the defendant has recovered sufficiently to understand the proceedings against him and to assist in his own defense the hospital superintendent shall notify the committing court thereof. The court shall thereupon issue an order remanding the defendant to the custody of the sheriff pending further proceedings in the cause, but if the court finds that the defendant has not so re-

covered the defendant shall be recommitted to the hospital." The mandatory provisions for return to court upon sufficient recovery establish that commitments under this statutory provision are made for treatment alone. No factor other than insufficiency of recovery justifies further confinement.

Two subsections of sec. 957.11 must be read together in seeking to determine whether the automatic commitments to Central State Hospital, following a verdict of not guilty by reason of insanity, are made for treatment with recovery the prerequisite to release. They are:

"(3)    If found not guilty because insane or not guilty because feeble-minded, the defendant shall be committed to the central state hospital or to an institution designated by the state department of public welfare, there to be detained until discharged in accordance with law."

"(4) . . . No person so committed shall be discharged unless the court, in addition to finding him sane and mentally responsible, also finds that he is not likely to have a recurrence of insanity or mental irresponsibility as will result in acts which but for insanity or mental irresponsibility would be crimes."

It is clear that the intent and result of this statutory enactment is not only to authorize but to direct continued confinement under this section beyond the full recovery of the patient until it is established that "he is not likely to have a recurrence of insanity or mental irresponsibility." This goes beyond treating the sick until well. It directs confinement until society is reassured that recurrence of insanity or mental irresponsibility will not result in acts which but for insanity or mental irresponsibility would be crimes.

The brief of the respondent state department concedes the protection of the public as a purpose of the confinement to Central State Hospital in this case, terming it a "dual purpose" and citing a recent federal court decision wherein the court stated that the purpose of detention under a statute providing for commitment of a person

acquitted of crime by reason of insanity ". . . is not punitive but rather serves a two-fold purpose: (1) to protect the public and the subject, and (2) to afford a place and procedure to treat and, if possible, to rehabilitate the subject." *Collins v. Cameron* (D. C. 1967), 377 Fed. 2d 945, 947.

At least, protection of the public and rehabilitation of the subject must be conceded to go beyond the concept of treatment in a treatment facility until recovery. In *State v. Esser*,[6] this court commented: "One object of our statutes is that one accused or convicted of crime who needs hospital care because of mental illness should have it as long as he needs it *and* until it is safe for society to have him restored to freedom." (Emphasis supplied.) The use of "and" instead of "or" makes clear the nonmedical treatment aspects of automatic confinement on one acquitted on a criminal charge on the grounds of insanity at the time of the commission of an alleged crime.

The primary importance of the public safety factor involved in the automatic confinement of a defendant acquitted on the grounds of insanity is made clear in *State v. Shoffner*.[7] Ordinarily, a jury is not to be informed of the effect of its answers upon the rights and liabilities of the parties. As an exception to this general rule, this court in the *Shoffner Case*, strongly recommended that, where insanity at the time of the offense is at issue, juries be given the following instruction:

". . . if you find the defendant not guilty by reason of insanity, he will not be released. If he is found to be not guilty by reason of insanity, he will be committed by this court to the central state hospital or to some other institution designated by the State Department of Public Welfare and will be detained there until this court in an appropriate mental examination shall determine that the defendant is sane and mentally responsible and further shall find that he is not likely to have a recurrence of

[6] (1962), 16 Wis. 2d 567, 590, 115 N. W. 2d 505.
[7] (1966), 31 Wis. 2d 412, 143 N. W. 2d 458.

insanity or mental irresponsibility such as would result in criminal acts." [8]

The emphasis upon confinement until the public safety justifies release is clear. The statutory provision for continued detention beyond the point of full recovery from insanity makes sec. 957.11 (3) more a protection to the public than a service to the parents of the minor.

If John Treglown had been found sane and convicted, he would have been sentenced beyond doubt to a state penal institution to be confined for the protection of the public and for his rehabilitation, if possible. In that event, the respondent would and could have made no claim upon his father and mother for maintenance costs while he was confined. He was found not guilty by reason of insanity and was committed to the Central State Hospital for the protection of the public and for his rehabilitation and treatment, if possible. The nontreatment factors involved in his commitment and the public safety requirements for his release militate strongly against requiring his father and mother to pay for his maintenance costs while confined. We find relevant this statement from the *Gardner Case*, cited above, substituting only the phrase "acquittal on the grounds of insanity" for the word "sentence" where it occurs:

"The central hospital, moreover, is a mere adjunct to or department of the state prison, in which only persons sentenced for crime, held upon charge of crime, or found not guilty of crime because of insanity are confined. But for his [acquittal on the grounds of insanity] the ward would never have been placed in the central hospital at all. His [acquittal on the ground of insanity] was the first step in the procedure resulting finally in his confinement in the central hospital. It is therefore the basis of his such confinement, the source of the authority therefor."

---

[8] Adapted from instruction approved in *Lyles v. United States* (D. C. 1957), 254 Fed. 2d 725. *See also McDonald v. United States* (D. C. 1962), 312 Fed. 2d 847.

In finding that the father and mother are not liable under sec. 46.10 (2), Stats., for the maintenance costs of their minor son while confined in Central State Hospital pursuant to sec. 957.11 (3), we are helped by the rule of law that a statute in derogation of the common law is to be strictly construed.[9] Except for sec. 46.10, there is no basis in common law or statutory law for a claim against parents for maintenance costs of their son while confined in a state hospital for the criminally insane. Construing the statute strictly, as applied to the parents, we find that it does not sustain the petition brought by the State Department of Health & Social Services.

*By the Court.*—Order reversed.

---

[9] *Estate of Bartels* (1960), 9 Wis. 2d 147, 152, 100 N. W. 2d 568; *Guardianship of Sykora* (1956), 271 Wis. 455, 458, 459, 74 N. W. 2d 164; *Derouin v. State Department of Public Welfare* (1952), 262 Wis. 559, 560, 55 N. W. 2d 871. (Rationale of the common law stated in *Richardson v. Stuesser* (1905), 125 Wis. 66, 72, 103 N. W. 261.)